**TURNER, DENNIS & LOWRY LUMBER CO. v. CHICAGO, M. & ST. P. RY. CO.**

(District Court, W. D. Missouri, W. D. October, 1924.)

No. 5703.

**1. Carriers ⬥30 — Must include demurrage charges in their tariff schedules; "train transportation."**

Under Interstate Commerce Act and its amendments (Comp. St. § 8563 et seq.), train transportation embraces all services in connection with the shipment, including storage of goods after arrival at destination, and every common carrier subject to the act is required in its tariffs to state separately demurrage and other terminal charges and to adhere thereto, as to other parts of its tariff schedule.

**2. Commerce ⬥89—Court without jurisdiction of action for reparation except on finding of Interstate Commerce Commission.**

No action for reparation for exaction of unreasonable or discriminatory demurrage charges can be maintained in any court in the absence of an appropriate finding by the Interstate Commerce Commission.

**3. Commerce ⬥91—Order of Commission or regulation of carrier may be set aside by courts only for want of power to make it.**

In determining whether an order of the Interstate Commerce Commission or a regulation of a carrier shall be suspended or set aside, power to make, and not the wisdom of the order or regulation, is the test.

**4. Carriers ⬥26 — Demurrage charge held within powers of carrier.**

A regulation made by the Director General of Railroads during federal control and continued by a carrier as part of its tariff schedule after such control ceased, imposing an additional demurrage or storage charge in the nature of a penalty for detention of cars beyond a stated time, is not a penal law for punishment of an offense which comes within the purview of constitutional guaranties, but is within the powers of the carrier under Interstate Commerce Act, subject to revision or abrogation by the Interstate Commerce Commission.

**5. Carriers ⬥30—Publication of tariff is notice to all shippers.**

The published tariff schedule of an interstate carrier is due notice of its terms to all shippers.

**6. Carriers ⬥26 — Reasonable classification may be made for purpose of demurrage charges.**

While a classification of traffic for the purpose of demurrage charges must be reasonable and not arbitrary, the interests of shippers of a particular kind of commodity are not alone to be regarded, but those of the carrier and the general shipping public as well.

**7. Carriers ⬥32(2) — Additional demurrage charge for prolonged detention of lumber cars held for reconsignment held not invalid as discriminatory.**

An additional demurrage or storage charge for detention of cars beyond a stated time *held* not invalid as discriminatory because limited to cars loaded with lumber held for reconsignment, where it appeared that it was a common practice to hold such cars for an unreasonable time awaiting reconsignment, thus keeping the cars out of normal use, to the detriment of the carrier and the public.

**8. Carriers ⬥32(3)—Tariffs may not discriminate to equalize business conditions.**

A tariff schedule may not be framed to equalize conditions of private business by giving special privileges and advantages to a particular shipper or class of shippers.

At Law. Action by the Turner, Dennis & Lowry Lumber Company against the Chicago, Milwaukee & St. Paul Railway Company. Trial to court, and judgment for defendant.

Rees Turpin, of Kansas City, Mo., and Edward A. Haid, of St. Louis, Mo., for plaintiff.

Fred S. Hudson, of Kansas City, Mo., and J. N. Davis, of Chicago, Ill., for defendant.

VAN VALKENBURGH, District Judge. During the period of federal control there was filed with the Interstate Commerce Commission, to be effective October 20, 1919, a tariff entitled "Penalties for Detention of Equipment" which provided that:

"To prevent undue detention of equipment under present emergency, the following additional penalties for detention of equipment will apply:

"On cars loaded with lumber held for reconsignment a storage charge of $10 per car will be assessed for each day or fractional part of a day that a car is held for reconsignment after 48 hours after the hour at which free time begins to run under the demurrage rules.

"These charges will be assessed regardless of whether cars are held on railroad hold tracks or transfer tracks, including consignee's or other private sidings, and will be in addition to any existing demurrage and storage charges."

After the termination of federal control, the defendant and other common carrier railroads continued to maintain said provision in the published tariffs until March 13, 1922, when it was canceled in pursuance of a decision and order of the Interstate Commerce Commission rendered on February 11, 1922. The Interstate Commerce Commission found that the charge, when made and while in force, was reasonable because of the great car shortage which then existed and which was aggravated by those shipping lumber upon consignment, but that owing to the fact that at the date of the order of cancellation a large surplus of serviceable empty cars existed, and, generally speaking, there was then no congestion in the country, the penalty in question was no longer necessary. On November 16, 1921, a carload of lumber was shipped to plaintiff at Aberdeen, S. D., and on November 28, 1921, the defendant notified plaintiff of the arrival thereof in accordance with the provisions of the natural car demurrage rules and charges. On December 5, 1921, plaintiff directed defendant to reconsign said car to the Central Warehouse Lumber Company at Minnesota Transfer, Minn. Defendant charged, and plaintiff paid, this charge of $10 per day for four days in addition to the previously existing demurrage charge. Plaintiff now seeks to recover back these payments, aggregating $40, on the ground that this additional charge was unlawful and beyond the power of the carrier to assess.

The case was tried upon an agreed statement of facts before the court, a jury having been waived in writing. The shipment, dates of storage, and amounts paid, are all uncontroverted; the sole question being whether the charge was lawfully assessed, and whether under the facts presented the plaintiff could, in any event, recover from the defendant in this action.

It is conceded that the privilege of reconsignment is accorded to shippers by tariff and traffic arrangements at the through rate in effect from the original point of shipment to the ultimate destination—a privilege which relieves the shipper from paying the higher combination of the local rate from the original point of origin to the first destination plus the local rate from the latter point to the ultimate destination. It is further conceded that demurrage charges for delay in releasing cars after a certain reasonable time specified in tariffs is not only legitimate but salutary in order that cars may be kept in commission for the accommodation of shippers and carriers alike—in other words, the general public. "The purpose of demurrage charges is to promote car efficiency by penalizing undue detention of cars. * * * In fixing the free time the framers of the [Demurrage] Code adopted an external standard; that is, they refused to allow the circumstances of the particular shipper to be considered. * * * The framers of the Code made no attempt to equalize conditions among shippers." Pennsylvania R. Co. v. Kittanning Iron & Steel Manufacturing Co., 253 U. S. 319, 323, 40 S. Ct. 532, 533 (64 L. Ed. 928).

It has been universally held that the duty of a railroad company as a carrier ends when the shipment is delivered to the consignee; that storage upon tracks is no part of the contract. It is recognized that in the absence of some imposed charge therefor shippers would use the cars and tracks of the carrier for storage and warehouse purposes to suit their convenience in resale and transshipment, thereby imposing a burden upon the carriers and causing the detention and withdrawal of cars from other pressing public uses; all of which would be reflected in increased cost of transportation and embarrassment to general marketing. Reasonable demurrage charges have therefore uniformly been upheld upon two grounds: Compensation to the carrier for storage and loss of use of its equipment, and a penalty upon the offending shipper

as a deterrent from the adoption of such practices. So far from increasing the revenues of the carrier in proportion to the demurrage charges exacted, experience has proved that substantial demurrage charges have been effective in promoting a speedier release of the rolling stock, thereby reducing the number of cars subject to the charge or penalty. The carriers prefer that their cars should be kept in the channels of transportation rather than in detention subject to demurrage, for the reason that thereby the revenue from hauling is increased, and for the further important reason that they are required, so far as possible, to have cars on hand to meet the demands of the shipping public generally. These facts and principles have been repeatedly found and announced by the Interstate Commerce Commission in its investigations and have been uniformly recognized by the courts.

[1] "Under the act to regulate commerce, as amended by the Hepburn Act of 1906, the term 'transportation' embraces all services in connection with the shipment, including storage of goods after arrival at destination;" and "so far as interstate carriers by rail were concerned the entire body of such services should be included together under the single term 'transportation' and subjected to the provisions of the act respecting reasonable rates and the like." Cleveland, C., C. & St. Louis Ry. v. Dettlebach, 239 U. S. 588, 36 S. Ct. 177, 60 L. Ed. 453. And, accordingly, it is made "the duty of all common carriers subject to the * * * act to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs," and it is the duty of the carrier to have just and reasonable rules and regulations in all matters relating to or connected with the receiving, handling, transporting, storing and delivering of property subject to the act. Section 1, par. 6, Interstate Commerce Act, 41 Stat. L. 474 (Comp. St. Ann. Supp. 1923, § 8563).

Accordingly, every common carrier subject to the Interstate Commerce Act must file with the Interstate Commerce Commission schedules showing all rates, fares, and charges for the transportation of property. Such tariffs shall state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect or determine any part, or the aggregate, of such rates, fares, and charges. Section 6, Interstate Commerce Act, 24 Stat. L. 379; 25 Stat. L. 855; 34 Stat. L. 584 (Comp. St. § 8569).

And the Interstate Commerce Commission may, upon complaint, or upon its own initiative, determine whether any rate, fare, or charge, or joint classification, regulation, or practice whatsoever, of any carrier, or carriers, is unreasonable in violation of section 1, or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of the Interstate Commerce Act. 41 Stat. L. 484–485 (Comp. St. Ann. Supp. 1923, §§ 8581–8583). And having filed such a schedule the carrier is required to adhere thereto without deviation unless otherwise ordered. Demurrage charges, therefore, or any regulation or practice in the nature thereof, must be duly filed as a tariff, or as part of a tariff, with the Interstate Commerce Commission. That was done in this case. It follows that any action of Commission or court with respect to such charges must be governed by the rules applicable to tariff schedules generally.

Plaintiff charges that the infliction and collection of these penalty charges was unlawful because—

(1) Congress could not delegate its legislative function of prescribing a penalty to either defendant or the Interstate Commerce Commission and has not even undertaken to do so.

(2) Inflicting a penalty on plaintiff without notice and without opportunity for hearing of any kind deprived plaintiff of its property without due process.

(3) Singling out shippers of lumber and punishing them for detaining cars which were reconsigned and relieving from such punishment other shippers who detained the same cars when used for other commodities and reconsigned denied plaintiff the equal protection of the laws and deprived it of its property without due process.

(4) Defendant subjected plaintiff and plaintiff's particular description of traffic to an undue or unreasonable prejudice or disadvantage in violation of the act to regulate commerce.

[2] If this suit be regarded as an action for reparation, as commonly understood, it would seem that the contention of the defendant that it should be dismissed for want of jurisdiction should be sustained.

No action for reparation for exactions of this nature can be maintained in any court, federal or state, in the absence of an appropriate finding and order of the Interstate Commerce Commission; and this rule applies to suits for recovery of unreasonable rates, as also to suits for recovery of rates as discriminatory, and demurrage charges fall within the same category. In this case it does not appear that any claim for reparation was filed with or urged before the Commission. But, in any event, the Commission has made no order for reparation, but on the contrary has held that this demurrage charge was reasonable and lawful. Hormel & Co. v Chicago, M. & St. P. R. Co. et al. (C. C. A.) 283 F. 915; C., B. & Q. R. Co. v. Merriam & Millard Co. (C. C. A.) 297 F. 1; Texas & Pacific Ry Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 S. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075; Robinson v. Baltimore & O. R. Co., 222 U. S. 506, 32 S. Ct. 114, 56 L. Ed. 288; Northern Pacific Ry. Co. v. Solum, 247 U. S. 477, 38 S. Ct. 550, 62 L. Ed. 1221; Loomis. v. Lehigh Valley R. Co., 240 U. S. 43, 36 S. Ct. 228, 60 L. Ed. 517; Texas & Pacific Ry. Co. v. American Tie & Timber Co., 234 U. S. 138, 34 S. Ct. 885, 58 L. Ed. 1255; Morrisdale Coal Co. v. Penn. R. Co., 230 U. S. 304, 33 S. Ct. 938, 57 L. Ed. 1494; Great Northern Ry. Co. et al. v Merchants' Elevator Co., 259 U. S. 285-291, 42 S. Ct. 477, 66 L. Ed. 943; Hite et al. v. Central R. of New Jersey, 171 F. 370, 96 C. C. A. 326.

There was no evidence before the Commission, and none before this court, to warrant a finding that the charge was unreasonable, nor that it worked discrimination, unless it be as matter of law in a respect hereinafter to be considered.

"Regulations which are primarily within the competency of the Interstate Commerce Commission are not subject to judicial supervision or enforcement until that body has been properly afforded an opportunity to exert its administrative functions." Baltimore & Ohio R. R. Co. v. Pitcairn Coal Co., 215 U. S. 481, 30 S. Ct. 164, 54 L. Ed. 292.

[3] And in determining whether an order of the Interstate Commerce Commission shall be suspended or set aside (and in this case a regulation of the carrier), power to make, and not the wisdom of the order, is the test. Interstate Commerce Commission v. Illinois Central R. R. Co., 215 U. S. 452, 30 S. Ct. 155, 54 L. Ed. 280; Great Northern Ry. Co. v. Merchants' Ele-

vator Co., 259 U. S. 285, 42 S. Ct. 477, 66 L. Ed. 943. It would seem, then, that in this case the court is confined to a consideration of the question of whether this tariff schedule is within the scope of the authority under which it purports to be made, and, if not, whether the plaintiff can recover.

[4] Plaintiff invokes the spirit of the Fifth and Fourteenth Amendments to the Constitution of the United States, claiming that its property has been taken without due process and that it has been denied the equal protection of the laws. It is conceded that article 5 is a limitation upon the federal government as such, and that article 14 applies to the states. The demurrage charge complained of is assessed by no statute, state or national, but it is presumed that the plaintiff bases its contention upon the holding that a published tariff, so long as it is in force, has the effect of a statute and is binding alike on carrier and shipper. Pennsylvania R. R. Co. v. International Coal Mining Co., 230 U. S. 184, 33 S. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915A, 315.

[5] Taking up now the claims of plaintiff that Congress could not delegate its legislative function of prescribing a penalty to either defendant or the Interstate Commerce Commission and has not undertaken to do so, and that inflicting a penalty on plaintiff without notice and without opportunity for hearing of any kind deprived plaintiff of its property without due process of law, it is to be observed that the Interstate Commerce Commission at least has prescribed no penalty. The railroad company, by its filed tariff, has assessed a penalty in the nature of a demurrage charge; but this can in no sense be regarded as in the nature of a penal law imposing punishment for an offense and coming, therefore, within the purview of the constitutional guaranties. It has been seen that the establishment of a demurrage charge in the nature of a penalty is within the power of the railroad under the Interstate Commerce Act. Its collection takes place in due course as all other rates and charges for transportation and its incidents. It requires no hearing as a prerequisite to its enforcement. The means for correcting it, if it be unreasonable, arbitrary, or discriminatory, are provided by the statute which satisfies the demand for due process. Such charges or penalties, in so far as they are penalties, do not partake of the nature of the offenses defined in the Interstate Commerce Act for which punishment may be inflicted

in the usual course of criminal procedure. The published tariff, without more, is due notice of the charge to all shippers who bring themselves within its terms.

This exaction, while entitled "Penalties for Detention of Equipment," and providing a storage charge of $10 per car under certain conditions, was, in effect, nothing more than an additional demurrage charge in the nature of an amendment to those already existing. While it is true that demurrage charges involve two elements, the one of compensation and the other of penalty, the amount applicable to compensation and that applicable to penalty is not proportioned. The case is not otherwise than if the original demurrage charges had been entirely abrogated, or had never existed, and such charges had been established by filed tariff embracing all those previously in effect and the $10 charge as well. There would then have been presented, not an exaction beyond the power of the carrier and of the Commission, but one subject to supervision and review, if desired, touching its reasonableness or its tendency to discrimination—purely administrative questions. It is not claimed that the charge is so grossly unreasonable as to be confiscatory, and certainly no evidence to that effect is before us.

[6] It is next urged that the charge singles out shippers of lumber and punishes them for detaining cars which were reconsigned and relieves from such punishment other shippers who reconsigned such cars when used for other commodities. It is also pointed out that this schedule singles out shippers of lumber who reconsign shipments and exempts other lumber dealers who ship without reconsignment. It is claimed that these things deny to plaintiff the equal protection of the laws and deprive it of its property without due process.

These criticisms involve simply the question of classification. It is well understood that a classification when made must be based upon some reasonable ground, something which bears a just and proper relation to the attempted classification and is not a mere arbitrary selection. Gulf, Colorado & Santa Fé Ry. Co. v. Ellis, 165 U. S. 150, 17 S. Ct. 255, 41 L. Ed. 666. Such classifications are not unusual in the establishment of railroad rates, and in their determination great latitude has been indulged. Many different things must be taken into consideration both by the carrier and by the Commission, the welfare and

advantage of the carrier and of the great body of the citizens of the United States who constitute the consumers and recipients of the merchandise carried. The attention of the Commission is not to be confined to the advantage of shippers or merchants in the matter of location or the character of business. Differences in freight rates are made because of differences in environment, local conditions, and the character of the commodity carried. As the Supreme Court says in Texas & Pacific R. Co. v. Interstate Commerce Commission, 162 U. S. 197, 219, 16 S. Ct. 666, 675 (40 L. Ed. 940):

"In deciding whether differences in charges, in given cases, were or were not unjust, there must be a consideration of the several questions whether the services rendered were 'like and contemporaneous,' whether the kinds of traffic were 'like,' whether the transportation was effected under 'substantially similar circumstances and conditions.' To answer such questions, in any case coming before the Commission, requires an investigation into the facts; and we think that Congress must have intended that whatever would be regarded by common carriers, apart from the operation of the statute, as matters which warranted differences in charges, ought to be considered in forming a judgment whether such differences were or were not 'unjust.' Some charges might be unjust to shippers—others might be unjust to the carriers. The rights and interests of both must, under the terms of the act, be regarded by the Commission."

To this should be added that the rights of the general shipping public are also to be taken into account, the demand for cars, the necessities for marketing, the emergencies of different classes of commodities and the manner in which business is done.

[7, 8] It appears in this case that a great shortage of cars existed; that this evil was increased by the practice of a large body of lumber dealers to detain cars for an unreasonable period while they were negotiating sales to be effected through reconsignments. From the report of the Commission in this case (American Wholesale Lumber Ass'n v. Director General, 66 Interst. Com. Com'n R. at page 406) it appears complainants insisted that:

"Operators of the small mill, who are limited as to capital and credit, are unable to carry lumber in stock for long periods; that it is impossible for them to sell on credit; that their limited output will not warrant the heavy cost of a sales organiza-

tion; that they are unacquainted with traffic matters and market conditions; that they must ship their lumber as soon as it is available and must realize their return quickly; and that therefore it is vital to the continuance of their business to have the right to reconsign without any restriction of that right by the imposition of a penalty charge when cars are delayed beyond a specified limit."

It was also urged upon the Commission: "That the unrestricted use of the reconsignment privilege is beneficial to the small lumber retailer in that, by being able to purchase cars of lumber in transit, quickly available to meet his needs, he requires less capital and less yard space, and can maintain a better rounded as well as a smaller stock on hand," etc.

It is evident from this that by such use of railway facilities such dealers sought to escape the natural disadvantage of small capital and inadequate facilities of their own. Of such reasons the law can take no cognizance. It does not seek to equalize natural conditions by special privileges and advantages to an individual shipper or class of shippers. The framers of the Demurrage Code refused to allow the circumstances of the particular shipper to be considered and refused to exempt shippers from demurrage charges because of conditions peculiar to them. Pennsylvania R. R. Co. v. Kittanning Co., 253 U. S. 323, 324, 40 S. Ct. 532, 64 L. Ed. 928; Texas & Pacific Ry Co. v. Interstate Commerce Commission, 162 U. S. 197–218, 16 S. Ct. 666, 40 L. Ed. 940. The carrier is not called upon to contribute its trackage and equipment for such purposes, nor is the shipping public required to suffer the resulting loss of transportation facilities. As said by the Circuit Court of Appeals of this circuit in Missouri Pacific Ry. Co. v. Union Stockyards Co., 204 F. 757, 759, 123 C. C. A. 131, 133:

"The imposition of demurrage implies delay through negligence or inattention, or a retention for personal uses, whereby the proper office of the cars in transportation is impaired."

No discrimination appears upon the face of this tariff. Only shippers of the same class, engaged in the same business, and who do business in the same way, are affected and all such are affected alike. There is no competition between lumber dealers and dealers in other commodities. The retention of cars upon consignments used for other commodities was found to be comparatively negligible. Shippers of lumber who do not reconsign cars are, of course, not subject to this charge; if they do practice reconsignment, then they are subject to the same penalties. The law cannot be made the instrument of creating an equilibrium between shippers differently situated to the disadvantage of the carrier and the general shipping public. This charge, so far as appears in this case, was imposed under authority of law, not for the purpose of inflicting a burden upon any class of dealers, but for the paramount purpose of affording greater facilities for transportation to the entire business public. Under no aspect of the case can the plaintiff prevail in this action, and the finding accordingly is for the defendant upon all counts. A judgment entry may be prepared in accordance with the views herein expressed.